TAYLOR HOME OF CHARLOTTE INC., Plaintiff v. CITY OF CHARLOTTE, NORTH CAROLINA, and ZONING BOARD OF ADJUSTMENT of the CITY OF CHARLOTTE, Defendants, and ROBERT F. MORAN, MARY O. MORAN, DONALD J. WINGO, PAT L. WINGO, DARRELL L. USSERY, CAROLYN H. USSERY, LINDA S. BECKHAM, BRIAN T. McFARLAND, SUE H. McFARLAND, MICHAEL J. HAZELTINE, MAXINE A. HAZELTINE, and YVONNE P. CARLYLE, Intervenors

No. 9326SC1021

(Filed 6 September 1994)

**1. Zoning § 113 (NCI4th)— facility for people with full-blown AIDS—adjacent property owners—standing to appeal decision of zoning administrator—showing of special damage**

Adjacent property owners had standing to appeal the decision of the local zoning administrator concluding that a facility to

house people with full-blown AIDS was a group home and that
the permit to build the facility was properly issued, since the
property owners offered sufficient evidence with regard to mar-
ket value, health, safety, and traffic considerations to show that
they would suffer some special damage amounting to a reduction
in the value of their property.

**Am Jur 2d, Zoning and Planning §§ 737 et seq.**

2. **Zoning § 46 (NCI4th)— group home primarily for rehabili-
tation—wide range of services not provided at group home**

Defendant board of adjustment did not act arbitrarily, mani-
festly abuse its authority, or commit an error of law when it inter-
preted a city zoning ordinance to require that a group home be
"primarily" for rehabilitation, interpreted the phrase "sheltered
living conditions for rehabilitation" to require that residents of a
group home be such that some day they could live normal lives,
and concluded that it was not the intent of the ordinance that
group home residents be provided an extraordinarily wide range
of personal, supportive, and medically related services but that
such a facility would more closely resemble a nursing home or
health institution.

**Am Jur 2d, Zoning and Planning §§ 234 et seq.**

3. **Zoning § 46 (NCI4th)— group facility for people with full-
blown AIDS—mainstreaming not possible—residents not
"handicapped"—facility not group home**

In determining whether a group facility designed to house six
persons with full-blown AIDS was a group home permitted in a
single-family residential area by a local zoning ordinance, the
board of adjustment correctly interpreted the language "normal
residential environment" to mean that the residents in a family
care home would be able to be mainstreamed to live a life on a
day-by-day basis in a single-family neighborhood"; furthermore,
the board property concluded that persons with full-blown AIDS
would not be similar to those handicapped persons described in
N.C.G.S. § 168-20 in being able to be mainstreamed into daily liv-
ing in a single-family zoned neighborhood.

**Am Jur 2d, Zoning and Planning §§ 234 et seq.**

Appeal by plaintiff from judgment entered 21 June 1993 by Judge
Marvin K. Gray in Mecklenburg County Superior Court. Heard in the
Court of Appeals 24 May 1994.

*Fontana, Fine & Copeley, by Leto Copeley, and Lesesne & Connette, by Louis L. Lesesne, Jr., for plaintiff-appellant.*

*David M. Smith, Senior Assistant City Attorney, for defendant-appellee City of Charlotte.*

*James, McElroy & Diehl, P.A., by Gary S. Hemric and J. Michael Mulvaney, for intervenors.*

LEWIS, Judge.

Plaintiff commenced this action in the superior court for review of a decision by the Zoning Board of Adjustment of the City of Charlotte (hereinafter the "Board"). The superior court affirmed the decision of the Board, and plaintiff appeals.

Plaintiff is a North Carolina non-profit corporation established for the purpose of providing housing for persons with full-blown acquired immune deficiency syndrome (AIDS). "Full-blown" AIDS is the final stage of the development of the HIV virus and occurs when opportunistic infections attack a person's destroyed immune system, taking advantage of the inability of the body to fight them. Gary L. Fanning, Jr., Note, *Countering Workplace Fear and Misapprehension Through Legal Protection: Options for the HIV-Positive Public Employee*, 33 Washburn L.J. 186 (1993). Those persons with full-blown AIDS are persons who have developed at least one life-threatening clinical condition that is clearly linked to HIV-caused immunodeficiency. Nancy A. Moore, Comment, *AIDS Discrimination Under the Rehabilitation Act: When a Physician Refuses to Treat, Who is Liable?*, 42 DePaul L. Rev. 505 (1992).

On 22 July 1992, plaintiff received preliminary approval from the Division of Facility Services of the North Carolina Department of Human Resources to operate a facility (hereinafter "Taylor Home" or the "home") as a six-bed "family care home." A "family care home" is defined as "a home with support and supervisory personnel that provides room and board, personal care and habilitation services in a family environment for not more than six resident handicapped persons." N.C.G.S. § 168-21(1) (1987). "Handicapped person" is defined as "a person with a temporary or permanent physical, emotional, or mental disability including but not limited to mental retardation, cerebral palsy, epilepsy, autism, hearing and sight impairments, emotional disturbances and orthopedic impairments but not including mentally ill persons who are dangerous to others as defined in G.S.

122C-3(11)b." § 168-21(2). N.C.G.S. § 168-22 (1987) provides in part that "[a] family care home shall be deemed a residential use of property for zoning purposes and shall be a permissible use in all residential districts of all political subdivisions."

On 11 December 1992, the Charlotte-Mecklenburg Building Standards Department issued plaintiff a building permit to construct the home at 5026 Lansing Drive in Charlotte. The permit was for construction of a group home. The City of Charlotte's zoning ordinances define a "group home" as "[a] residential home provided by an agency, organization or individual for persons who need sheltered living conditions for rehabilitation, but not including mentally ill persons who are dangerous to others as defined in G.S. Sec. 122C-3(11)b, as amended." Charlotte, N.C., Code § 2.201(G3). The zoning ordinances further provide that a group home may be constructed in an area which is zoned single-family residential, though there is no mention of family care homes.

After construction of the home began, residents of the neighborhood, upon learning of the intended use, challenged the issuance of the building permit. The zoning administrator concluded that the facility was a group home and that the permit was properly issued. The neighbors then appealed the zoning administrator's decision to the Board, pursuant to N.C.G.S. § 160A-388(b) (1987). The Board held a hearing and concluded that the residents of the home would not be handicapped persons within the meaning of the family care home statutes and that the home was not a group home within the meaning of the local ordinance. The Board further concluded that the building permit was erroneously issued. From the decision of the Board, plaintiff petitioned the superior court for review by certiorari, pursuant to § 160A-388(e), and the neighbors filed a motion to intervene. The superior court allowed the motion to intervene and affirmed the decision of the Board. From the judgment of the superior court, plaintiff appeals.

I.

[1] Plaintiff's first contention is that the nearby homeowners lacked standing to appeal the decision of the zoning administrator to the Board. Appeals may be taken to the Board by "any person aggrieved." N.C.G.S. § 160A-388(b). An aggrieved person is one who can either show an interest in the property affected, or if the person is a nearby property owner, some special damage, distinct from the rest of the community, amounting to a reduction in the value of his property.

*Allen v. City of Burlington Bd. of Adjustment*, 100 N.C. App. 615, 618, 397 S.E.2d 657, 659 (1990).

In the case at hand, the neighbors all owned land adjacent to the Taylor Home property. Thus, they were required to show some special damage amounting to a reduction in the value of their property. The neighbors presented to the Board a letter from Clark W. Gregory, a certified North Carolina real estate appraiser, in which Clark stated: "The most important concern I have is the effect of the proposed facility on the marketability/expected prices of the adjacent properties. . . . [I]t is inevitable that the facility, if completed, will have an adverse impact on the adjacent properties." Fred Nordman, a nearby property owner, gave sworn testimony at the Board hearing regarding the increased traffic on the cul-de-sac that would result. Nordman testified that his concerns included the safety of the children who play in the cul-de-sac as well as the necessity of access for emergency vehicles to the cul-de-sac. Mary Elizabeth Moran, an adjacent property owner, testified before the Board of her concerns about the disposal of potentially bio-hazardous material at Taylor Home.

We conclude that the above evidence was sufficient to show that the adjacent property owners would suffer some special damage, amounting to a reduction in the value of their property. The Board appropriately considered, in addition to the evidence regarding market value, the testimony of the property owners concerning health, safety, and traffic considerations. *See Kentallen, Inc. v. Town of Hillsborough*, 110 N.C. App. 767, 769-70, 431 S.E.2d 231, 232 (1993) (persons may be "aggrieved" by effects such as increased traffic congestion, noise, risk of fire).

II.

Plaintiff's remaining arguments concern the merits of the Board's decision to rescind the building permit. The Board's hearing on the matter was conducted as a quasi-judicial proceeding, *see County of Lancaster, S.C. v. Mecklenburg County, N.C.*, 334 N.C. 496, 434 S.E.2d 604 (1993), and, therefore, the standard of review is that set out by our Supreme Court in *Coastal Ready-Mix Concrete Co. v. Board of Commissioners*, 299 N.C. 620, 265 S.E.2d 379 (1980). The standard of review is the same for the superior court and this Court, and it includes reviewing the record for errors of law, insuring that the decision was supported by competent, material, and substantial evidence in the whole record, and insuring that the decision of the board was not arbitrary and capricious. *Id.* at 626, 265 S.E.2d at 383.

TAYLOR HOME OF CHARLOTTE v. CITY OF CHARLOTTE

[116 N.C. App. 188 (1994)]

Plaintiff contends that the superior court erred in affirming the decision of the Board, in that the Board's decision contained errors of law, was not supported by competent, material, and substantial evidence, and was arbitrary and capricious.

## III.

[2] We first address plaintiff's arguments regarding the Board's conclusion that the home was not a group home under the city ordinance. Again, the ordinance defines a "group home" as "[a] residential home provided by an agency, organization or individual for persons who need sheltered living conditions for rehabilitation, but not including mentally ill persons who are dangerous to others." Code § 2.201(G3). Plaintiff's first contention concerns the Board's conclusion that the Taylor Home residents "will not be occupying the structure *primarily* 'for rehabilitation', as required by Code § 2.201(G3), and *cannot be restored to live normal lives* as meant by the 'sheltered living conditions for rehabilitation' in Code § 2.201(G3)." (Emphasis added). Plaintiff argues that the Board exceeded its authority by adding the language emphasized above to the language of the ordinance. We disagree.

It is the duty of a board of adjustment to interpret a local ordinance and to apply that interpretation to the facts before the board. *Midgette v. Pate*, 94 N.C. App. 498, 502, 380 S.E.2d 572, 575 (1989). Because the board of adjustment is vested with reasonable discretion in determining the intended meaning of an ordinance, a court may not substitute its judgment for the board's in the absence of error of law, or arbitrary, oppressive, or manifest abuse of authority. *P.A.W. v. Town of Boone Bd. of Adjustment*, 95 N.C. App. 110, 113, 382 S.E.2d 443, 444-45 (1989). Thus, our task on appeal is not to decide whether another interpretation of the ordinance might reasonably have been reached by the board. *Id.* at 115, 382 S.E.2d at 446.

We cannot say that the Board acted arbitrarily, oppressively, manifestly abused its authority, or committed an error of law when it interpreted the ordinance to require that a group home be "primarily" for rehabilitation. The ordinance itself mentions only one purpose for group homes, and that is rehabilitation. We find the conclusion that group homes must be primarily for rehabilitation to be reasonable and lawful.

Likewise, we conclude that the Board acted reasonably in interpreting the phrase "sheltered living conditions for rehabilitation." The

Board interpreted that language to require that the residents of a group home be such that some day they could live normal lives. The Board found as a fact that "a dictionary commonly defines 'rehabilitation' to mean the restoring of a handicapped or delinquent person to a useful life through education and therapy." As the ordinance does not define "rehabilitation," the Board properly used the ordinary and common meaning of the word to give meaning to the language of the ordinance. *See Raleigh Place Assocs. v. City of Raleigh, Bd. of Adjustment*, 95 N.C. App. 217, 219, 382 S.E.2d 441, 442 (1989).

Plaintiff's final argument regarding the group home ordinance is that the Board improperly concluded that it was not the intent of the ordinance that group home residents be provided "an extraordinarily wide range of personal, supportive, and medically-related services in order to be comfortable in a family environment with a terminal disease." Plaintiff argues that this conclusion bears no relation to the language of the ordinance, and specifically, that the ordinance does not mention the word "services."

The services the Board referred to were detailed in the Supportive Services Plan which plaintiff submitted to the U.S. Department of Housing and Urban Development. The services to be provided to the residents at the home included: housekeeping and laundry services; assistance with bathing, feeding, dressing, and other activities of daily living; transportation; detailed management, dispensing, labeling, administration, storage, and disposal of drugs; and arrangements for physician service. The Board concluded that because the residents of the home would have full-blown AIDS, thus requiring the extensive services set out above, the home did not fit the definition of a group home. Rather, the home more closely resembled a "nursing home" or a "health institution," as defined by city ordinance, neither of which is permitted in a single-family zoned district.

A "nursing home" is defined as "[a] facility providing care for 3 or more sick, aged or disabled persons not related by blood or marriage to the operator. Nursing homes are classified as 'dependent' or 'independent' living facilities depending upon the degree of support services on site." Code § 2.201(N5). "Dependent living facility" is defined as "[n]ursing homes, rest homes and homes for the aged which are designed for persons who need a wide range of health and support services located on the site, such as medical and nursing care, central dining, and transportation services." Code § 2.201(D3). Finally, a "health institution" is defined as

[a] hospital, clinic (not including veterinary), health maintenance organization, or similar use or building, not including a group home, which routinely provides for the care of, treatment of, and testing for physical, emotional, or mental injury, illness, or disability, and for the overnight boarding of patients, either on a for-profit or not-for-profit basis.

Code § 2.201(H3).

We believe that the fact that the group home definition does not mention the word "services" does not cast doubt on the Board's conclusion. On the contrary, that fact and the fact that the nursing home and dependent living facility definitions do include the word "services" lends support to the Board's conclusion that a home whose residents would have full-blown AIDS and would require the services as described in the Supportive Services Plan would not be a group home, but would more closely resemble a nursing home or a health institution. We hold that the Board's conclusion regarding the intent of Code § 2.201(G3) (group homes) was not arbitrary, oppressive, without authority, or otherwise affected by error of law.

IV.

[3] Plaintiff's final contention on appeal is that the Board erred in concluding that the residents of Taylor Home would not be handicapped persons within the meaning of the family care home statutes. We note that the interpretation of a statute is a matter of law, and error in the interpretation of a statute is an error of law. *Savings & Loan League v. Credit Union Comm'n*, 302 N.C. 458, 464, 276 S.E.2d 404, 409 (1981).

N.C.G.S. § 168-21(2) defines "handicapped person" as "a person with a temporary or permanent physical, emotional, or mental disability including but not limited to mental retardation, cerebral palsy, epilepsy, autism, hearing and sight impairments, emotional disturbances and orthopedic impairments but not including mentally ill persons who are dangerous to others as defined in G.S. 122C-3(11)b." Plaintiff first argues that the Board erred in concluding that

General Statutes' Chapter 168, Article 3 [Family Care Homes], contemplates that handicapped persons like those identified in G.S. § 168-21(2) (e.g., mental retardation or cerebral palsy) can be "mainstreamed" to live a life on a day-by-day basis in a single family neighborhood and the Taylor Home residents are not similar to those "handicapped persons" described in G.S. § 168-21(2) in

being able to be "mainstreamed" into daily living in a single family zoned neighborhood.

Specifically, plaintiff contends that the Board erred in adding to the statute the requirement that the residents be able to be " 'mainstreamed' to live a life on a day-by-day basis in a single family neighborhood." We disagree.

The intent of the legislature in providing for family care homes is stated in N.C.G.S. § 168-20 (1987): "[I]t is the public policy of this State to provide handicapped persons with the opportunity to live in a normal residential environment." We believe that the Board correctly interpreted the language "normal residential environment" to mean that the residents in a family care home would be able to be " 'mainstreamed' to live a life on a day-by-day basis in a single family neighborhood." Further, the Board properly concluded that persons with full-blown AIDS would not be similar to those handicapped persons described in the statute in being able to be mainstreamed into daily living in a single family zoned neighborhood.

Plaintiff's second argument is that the Board erred in concluding that the residents of Taylor Home would be receiving "an extraordinarily wide range of personal, supportive, and medically-related services in order to be comfortable in a family environment with a terminal disease, which is not the intent of Chapter 168, Article 3." In support of its argument, plaintiff points out that the family care home regulations promulgated by the Department of Human Resources detail the services to be provided in family care homes and are virtually identical to those listed in plaintiff's Supportive Services Plan. *See* N.C. Admin. Code tit. 10, r. 42C.2300 (November 1993). Further, plaintiff cites two sections of the regulations which specifically refer to HIV residents. For example, section 42C.2303(d)(1) regarding food service provides in part: "Variations from the required three meals, menus and specified time intervals to meet individualized needs of residents in an HIV designated facility shall be planned or reviewed by a physician and registered dietician and documented." Section 42C.2304(c)(2) regarding activities provides in part: "In addition to individual activities, there must be a minimum of 10 hours of planned group activities per week. Homes designated for residents with HIV disease are exempt from the 10-hour requirement . . . ." Plaintiff contends that these regulations show that the intent of the legislature was to include persons with AIDS within the definition of "handicapped person[s]" in N.C.G.S. § 168-21(2).

It is clear that the Department of Human Resources interprets the family care home statutes to include HIV residents. It is not clear, however, that the Department of Human Resources would also interpret the statutes to include residents with full-blown AIDS, such as the residents of Taylor Home. In any event, while the interpretation given a statute by the agency charged with administering that statute is traditionally accorded some deference by appellate courts, that interpretation is not binding. *Savings & Loan League,* 302 N.C. at 466, 276 S.E.2d at 410. In light of the legislature's goal of providing "handicapped persons with the opportunity to live in a normal residential environment," we conclude that it was not the intent of the legislature to include persons with full-blown AIDS within the definition of "handicapped person[s]" in section 168-21(2).

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

Judges EAGLES and COZORT concur.